# In the Iowa Supreme Court

No. 25–0873

Submitted March 26, 2026—Filed May 1, 2026

In re **Election Contest of Highland School Bond Referendum.**

**Ronald Greiner** and **Marcus Fedler,**

Appellants,

vs.

**Highland Community School District,**

Appellee.

Appeal from the Iowa District Court for Washington County, Michael Carpenter, judge.

Election contestants appeal the district court's affirmance of a contest court's rejection of an election contest. **Affirmed.**

May, J., delivered the opinion of the court, in which all justices joined except Mansfield, J., who filed an opinion concurring in the judgment.

Sasha L. Finke (argued) of Finke Law Firm, PLC, Ainsworth, for appellants.

Andrew Tice (argued) of Ahlers & Cooney, P.C., Des Moines, for appellee.

**May, Justice.**

Iowa's elected lawmakers have enacted a statutory framework that governs election contests. Under this framework, if an election is contested on the basis of "illegal votes," the contestant must provide a statement "setting forth the names of the persons who are alleged to have voted illegally." Iowa Code § 62.5(2)(*e*) (2024).

This case involves a contest of a school bond election. The basis for the contest is "illegal votes." But the contestants did not provide any names of any persons who are alleged to have voted illegally.

Because the contestants did not comply with the statutory requirement of naming the persons who are alleged to have voted illegally, the contest cannot succeed. The district court was correct to affirm the contest court's rejection of the contest. We affirm.

## I. Background Facts and Proceedings.

In 2024, the Board of Directors for the Highland Community School District (Highland CSD) called an election on a $15 million bond measure to fund improvements at two school buildings. The bond measure was placed on the ballot for the November 5 election.

The Highland CSD includes parts of Washington County. Washington County has five voting precincts. One of these precincts, Ainsworth, is at the center of this case.

In Ainsworth, all election-day voters cast their votes at the same polling place. But some Ainsworth voters resided inside the Highland CSD, while others did not. So, on election day, two kinds of ballots were delivered to the Ainsworth polling place. One kind of ballot included the Highland CSD bond measure. The other kind did not.

But election officials at Ainsworth overlooked this distinction. So, for part of the voting day, ballots with the bond measure were distributed to all Ainsworth voters.

At some point in the day, officials corrected course. From then on, ballots with the bond measure were distributed only to voters who were registered as residing in the Highland CSD.

By statute, the bond measure needed 60% approval to pass. Iowa Code § 296.6. This threshold was achieved. The bond measure passed with 61.3% of the vote, consisting of 1,361 "yes" votes and 861 "no" votes.

Within the Ainsworth precinct, the bond measure received 246 "yes" votes, 256 "no" votes, and 41 "undervotes" (meaning that 41 ballots did not reflect any vote on the measure). No record evidence shows how any particular person voted or where they resided. But the record does contain a relevant email from the Washington County Auditor. It reports that although 289 Ainsworth voters were registered as residing in the Highland CSD, 385 ballots with the bond measure were distributed to Ainsworth voters. This suggests that 96 voters received a ballot with the bond measure but were not registered as residing in the Highland CSD. Other evidence shows that among the election-day votes at Ainsworth, there were 26 undervotes on the bond measure.[1] All things considered, then, there is evidence that 70 votes were cast on the bond measure by Ainsworth voters who were not registered as residing in the Highland CSD.

The election was contested before the Washington County Election Contest Board, which we refer to as the "contest court." The contestants raised objections under Iowa Code section 57.1(2)(*e*) and (*f*). Important here, section 57.1(2)(*e*)

---

[1]It appears undisputed that the ballot mix-up only impacted the election-day vote, not the absentee vote. So we focus only on the 26 election-day undervotes rather than the total undervote count of 41, which includes 15 absentee undervotes.

allows challenges based on the casting of "illegal votes" in numbers "sufficient to change the result of the election." *Id.* § 57.1(2)(*e*).

The contest court rejected the contest by a vote of 2–1. In its memorandum of decision, the contest court focused on Iowa Code section 57.4, which states, "When the misconduct, fraud, or corruption complained of is on the part of the precinct election officials in a precinct, it shall not be held sufficient to set aside the election, unless the rejection of the vote of that precinct would change the result as to that office." The court noted that even "[i]f the votes in the Ainsworth precinct were rejected in total, the vote would [still] pass by the required [60%] majority." Therefore, the court reasoned, section 57.4 precluded any challenge.

The contestants then appealed to the district court. *See id.* § 62.20. The Highland CSD moved for summary judgment. The contestants resisted and also moved for summary judgment. The contestants argued that section 57.4 wasn't relevant because their contest was not based on misconduct by election officials. *See id.* § 57.1(2)(*a*). Instead, the contestants emphasized, they were raising an "illegal votes" challenge under Iowa Code section 57.1(2)(*e*).

Following a hearing, the district court entered an order granting summary judgment in favor of the Highland CSD. The district court rejected the contest court's view that the case involved misconduct by precinct election officials. Even so, the district court still rejected the contestants' "illegal votes" challenge because the contestants had failed to comply with section 62.5(2)(*e*), which required the filing of a statement "setting forth the names of the persons who are alleged to have voted illegally." And so the court affirmed the contest court's rejection of the contest.

The contestants now appeal from the district court's ruling.

**II. Issue on Appeal and Standard of Review.**

On appeal, the contestants argue that the district court's erroneous interpretation of Iowa Code section 62.5(2)(*e*) led to an improper grant of summary judgment. We review the district court's interpretation of statutes for legal error. *Gluba v. State Objection Panel*, 11 N.W.3d 459, 464 (Iowa 2024) (per curiam). We also review summary judgment rulings for legal error. *Singh v. McDermott*, 2 N.W.3d 422, 424 (Iowa 2024). We affirm a grant of summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3).

**III. Merits.**

**A. Iowa's Election Contest Law.** Before addressing the contestants' specific contentions, we briefly survey the legal framework that governs election contests in Iowa.

1. *The framework.* At common law, there was no right to contest an election. *Bauman v. Maple Valley Cmty. Sch. Dist.*, 649 N.W.2d 9, 13 (Iowa 2002). Any right to contest an election is statutory. *Id.*

In Iowa, the statutes authorizing election contests are codified in Iowa Code chapters 57 through 62. Chapter 57 contains general provisions that apply to all kinds of election contests. Meanwhile, chapters 58 through 62 each contain provisions that apply to particular sorts of contests. For example, chapter 62 contains provisions that govern contests of county officer elections. Thanks to Iowa Code section 57.6, however, the provisions of chapter 62 also apply "as near as may be, to contested elections . . . for public measures," like school bond elections. All told, then, a school bond election contest (like this one) is governed both by chapter 57 and, to the extent possible, chapter 62.

2. *Permissible grounds.* The permissible "grounds for contesting an election" are stated in Iowa Code section 57.1(2). There are eight permissible grounds. They are listed as paragraphs (2)(*a*) through (*h*).

Three of those grounds have been mentioned at some point in this case. First, under section 57.1(2)(*a*), a contest may be based on "[m]isconduct, fraud or corruption on the part of any election official . . . of sufficient magnitude to change the result of the election." As mentioned, though, the contestants emphasize that they have not raised—and are not raising—a challenge based on misconduct by an election official. Therefore, the contestants say, section 57.1(2)(*a*) is not relevant. We accept this representation.

We turn next to section 57.1(2)(*f*), which permits a contest based on "[a]ny error in any board of canvassers in counting the votes, or in declaring the result of the election, if the error would affect the result." This was one of the grounds that the contestants raised before the contest court. On appeal, however, the contestants advise that they are no longer pursuing a claim under section 57.1(2)(*f*). We accept this representation.

This brings us to Iowa Code section 57.1(2)(*e*), which allows challenges based on the casting of "illegal votes" in numbers "sufficient to change the result of the election." In their briefs, and again at oral argument, the contestants clarified that section 57.1(2)(*e*) is the sole ground on which they now rely.

3. *Initiating a contest.* No matter which grounds are relied on, though, every contestant must comply with section 62.5, which governs the initiation of election contests. Paragraph (1) requires the contestant to timely file "a written statement of intention to contest the election." *Id.* § 62.5(1). And paragraph (2) lists the required contents of the statement, as follows:

> *a.* The name of the contestant and that the contestant is qualified to hold such office.

*b.* The name of the incumbent.

*c.* The office contested.

*d.* The date of the election.

*e.* The particular causes of the contest pursuant to section 57.1, subsection 2. *If a cause of the contest is an allegation that illegal votes were received or that legal votes were rejected, a statement shall be included setting forth the names of the persons who are alleged to have voted illegally or whose votes were rejected and the precinct where they voted or offered to vote.*

*f.* The affidavit of the contestant, or some elector of the county, affirming the causes set forth are true.

*Id.* § 62.5(2) (emphasis added).

Of course, some of these requirements—such as the "name of the incumbent" and the "office contested"—can apply only to contests of elections for *offices.* They cannot apply to contests of school bond elections. It is clear, however, that some of these requirements *do* apply to school bond contests, including the contest before us now. In particular, it is clear that the requirements of section 62.5(2)(*e*) apply here. The real questions are how those requirements apply and what result they require.

**B. Analysis.** As explained, the district court reasoned that because the contestants' claim is based on "an allegation that illegal votes were received," section 62.5(2)(*e*) required the contestants to provide a statement "setting forth the names of the persons who are alleged to have voted illegally." Iowa Code § 62.5(2)(*e*). But the contestants did not provide the names of any "persons who are alleged to have voted illegally." *Id.* Therefore, the district court found that the contestants "cannot bring a contest under section 57.1(2)(*e*)."

We agree with the district court's reasoning and conclusion. As mentioned, under Iowa law, the right to contest an election is statutory. *Bauman,* 649 N.W.2d at 13. To succeed, a contestant must comply with the governing

statutes. And the governing statutes plainly required the contestants here to provide the names of the allegedly illegal voters. Iowa Code § 62.5(2)(*e*). Because the contestants provided no names, their contest could not succeed. The district court ruled correctly, and we must affirm.

**C. Other Jurisdictions.** As just explained, our reasoning and conclusion are based on Iowa law, especially section 62.5(2)(*e*). Even so, we note that some other states have enacted requirements similar to those in section 62.5(2)(*e*). For example, in Colorado, a contestant who alleges "the reception of illegal votes . . . as the grounds for the contest" must provide "a list of the eligible electors who so voted or offered to vote." Colo. Rev. Stat. § 1-11-213(7) (2026). In Delaware, a contestant who alleges "illegal votes" must provide the names, residences, and other information about "each person alleged to have illegally voted." Del. Code Ann. tit. 15, § 5945 (2026). In Idaho, a contestant who alleges "reception of illegal . . . votes . . . as a cause of contest" must provide "the names of the persons who so voted." Idaho Code § 34-2009 (2025). In Michigan, a contestant who alleges that some voters "were unqualified to vote" must provide a statement "naming" the allegedly unqualified voters and "stating . . . their place of residence." Mich. Comp. Laws § 168.748 (2026). In Nebraska, a contestant who alleges some "votes are illegal" must provide "the names of the voters whose votes are contested." Neb. Rev. Stat. § 32-1109(1) (2025). And in Wisconsin, a contestant who "claims that illegal votes were cast" must "state" "the names of the persons" who allegedly "cast illegal votes." Wis. Stat. § 784.06 (2026).

Although we have not found cases interpreting all of these statutes, we have found some. And those cases tend to support the approach we pursue today. *Kay v. Strobeck*, 254 P. 150, 151 (Colo. 1927) (stating that the trial court

"properly refused to declare [a particular] vote illegal" because the voter's name was not set forth in the contestant's statement despite a Colorado statute—Section 7798, C. L. 1921—that required "the names of all the illegal voters" to be "set forth in the statement of contest"); *McKay v. Bartels*, 3 N.W.3d 920, 928 (Neb. 2024) (observing that election contestants who allege the receipt of illegal votes must specify "the names of the voters whose votes" are so challenged); *State ex rel. Lochschmidt v. Raisler*, 114 N.W. 118, 120 (Wis. 1907) (observing that certain "statements of fact"—including "the names of the persons" who are claimed to have "voted illegally"—are "imperatively required by the statute" to be included in a contestant's complaint), *overruled on other grounds by*, *Boerschinger v. Elkay Enters., Inc.*, 132 N.W.2d 258 (Wis. 1965).

A good example is the Colorado Supreme Court's en banc decision in *Abts v. Board of Education of School District RE-1 Valley in Logan County*, 622 P.2d 518 (Colo. 1980) (en banc). Like the present case, *Abts* arose from a successful election on a school bond measure. *Id.* at 520. The contestants filed a notice of contest that alleged several grounds, including an allegation "that ballots of unqualified voters were received." *Id.* The trial court dismissed the contest, and the contestants appealed. *Id.* at 521. The Colorado Supreme Court affirmed. *Id.* at 527. As to the contestants' claims of allegedly unqualified voters, the court said this:

> Where the cause of contest is that illegal votes have been received, the statute mandates factual specificity. Section 1-10-110(6), C.R.S. 1973, requires that "(w)hen the reception of illegal votes or the rejection of legal votes is alleged as the cause of the contest, a list of the number of persons who so voted, or offered to vote, shall be set forth in the statement of [contestant] . . . . " This provision requires a list of the names of persons whose votes were received illegally. Because the [contestants] did not comply with the statute, the trial court could not consider the challenge.

*Id.* at 522–23 (first alteration and omission in original) (citations omitted).

As explained, we think that similar reasoning applies here. Because the contestants here did not comply with Iowa's statutory requirement to provide "the names of the persons who are alleged to have voted illegally," the district court could not consider their challenge. Iowa Code § 62.5(2)(*e*).

**D. Counterarguments.** We have considered all of the contestants' counterarguments. For instance, we have considered the contestants' emphasis on Iowa Code section 62.14, which provides that a "statement shall not be dismissed for want of form, if the particular causes of contest are alleged with such certainty as will sufficiently advise the incumbent of the real grounds of contest." But we do not think this general provision could allow us to ignore the specific requirements that section 62.5(2)(*e*) imposes when a contest is based on "an allegation that illegal votes were received." *Id.* § 62.5(2)(*e*); *see also id.* § 4.7. In any event, like the district court, we don't think the real problem here is about "want of form," as section 62.14 puts it. Rather, the real problem here is about substance. The necessary substance is the "names of the persons who are alleged to have voted illegally." *Id.* § 62.5(2)(*e*). Because those names were not provided, section 62.5(2)(*e*) is not satisfied.

We have also considered the contestants' reliance on Iowa Code section 62.15, which provides that if "any part of the causes [alleged in the contestants' statement] are held insufficient, they may be amended." But section 62.15 also provides that "[i]f no amendment is asked for or made, . . . the proceedings may be dismissed." The contestants here did not ask to make an amendment that would satisfy section 62.5(2)(*e*)'s naming requirement. So section 62.15 does not prevent dismissal of the contest.

We have also considered the contestants' theory that section 62.5(2)(*e*) requires only substantial compliance, not strict compliance. And it is true, as the contestants note, that in some *other contexts*, we have sometimes said that substantial compliance can satisfy statutory requirements. *See, e.g., Puente v. Civ. Serv. Comm'n*, 7 N.W.3d 15, 19–20 (Iowa 2024) (applying the substantial compliance standard to requirements of Iowa Code section 400.27(4)). But we have also made it clear that "[t]he right to contest an election is only conferred by statute, and contestants must *strictly comply* with the provisions of the statute in order to confer jurisdiction." *Taylor v. Cent. City Cmty. Sch. Dist.*, 733 N.W.2d 655, 657 (Iowa 2007) (emphasis added); *see Bauman*, 649 N.W.2d at 13 ("Because any right to contest an election is acquired by statute, contestants must strictly comply with the statutory provisions necessary to confer jurisdiction."); *de Koning v. Mellema*, 534 N.W.2d 391, 394 (Iowa 1995) ("The rule is quite generally recognized that to initiate special proceedings, such as election contest proceedings, the statutory provisions necessary to confer jurisdiction must be strictly complied with by the contestants."); *see also In re AHST Cmty. Sch. Dist. Pub. Measure "B" Election*, 735 N.W.2d 605, 607 (Iowa 2007) ("Iowa Code sections 62.5 and 62.6 are special statutes that confer subject matter jurisdiction on district courts."). We decline to take a different path here.

Finally, we have considered the contestants' point that Iowa Code section 57.1(2)(*e*), which authorizes challenges based on illegal votes, does not *itself* require "proof of the names of illegal voters." Therefore, the contestants argue, we should simply disregard the naming requirement imposed by section 62.5(2)(*e*) where, as here, the number of allegedly illegal votes was large enough to change the result in the election.

We cannot agree. Democracy requires courts to follow the statutes enacted by the people's elected lawmakers. Section 62.5(2)(*e*) is one of those statutes. So we must give effect to section 62.5(2)(*e*)'s plain language, including its unambiguous requirement that contestants provide the names of voters who allegedly cast illegal votes. Because the contestants failed to comply with this naming requirement, their contest must fail.

**IV. Disposition.**

The district court was correct to affirm the contest court's rejection of the contest. We affirm.

**Affirmed.**

All justices concur except Mansfield, J., who files an opinion concurring in the judgment.

**Mansfield, Justice (concurring in the judgment).**

I respectfully concur in the judgment.

### I. Strict Compliance Doesn't Have a Materiality Exception.

I agree with much of the court's well-reasoned opinion. Election contests are a creature of statute, and strict compliance with the statute is necessary. *See Taylor v. Cent. City Cmty. Sch. Dist.*, 733 N.W.2d 655, 657 (Iowa 2007) ("The right to contest an election is only conferred by statute, and contestants must strictly comply with the provisions of the statute in order to confer jurisdiction."); *see also Bauman v. Maple Valley Cmty. Sch. Dist.,* 649 N.W.2d 9, 13 (Iowa 2002) ("When a statute prescribes a procedure for review, that procedure must be strictly followed to confer jurisdiction."). Therefore, the contestants' argument that the names of the voters who cast illegal votes "were not necessary to establish the illegality of the votes" does not persuade me. Materiality is an important consideration for *substantial compliance*, but the contest laws require *strict compliance.*

In addition, I do not believe that Iowa Code section 62.14 rescues the contestants. It states, "The statement shall not be dismissed for want of form, if the particular causes of contest are alleged with such certainty as will sufficiently advise the incumbent of the real grounds of contest." Iowa Code § 62.14 (2024). I read this provision as allowing some degree of flexibility in stating the "grounds of contest." *See Burchett v. Hill,* 39 N.W.2d 305, 306 (Iowa 1949) (holding that a petition should not have been dismissed where respondent "was sufficiently advised as to all issues in controversy"). The grounds for contest are not the issue here.

**II. If Strict Compliance Is Impossible, It Can Be Excused.**

However, the record suggests that it may have been *impossible* to determine who cast the illegal votes. As noted by the majority, for part of the election day, November 5, 2024, all Ainsworth voters received a ballot that included the bond referendum, whether they lived in the district or not. This mistake was corrected in the middle of the day, but by then 96 in-person election-day voters had already cast the wrong ballots. At least 70 and potentially as many as all 96 of them voted in the bond referendum even though they were not entitled to. According to the contestants, there is no way to determine who those 70 to 96 voters were. Although the parties' briefing doesn't explain why, it seems plausible that this is because the Ainsworth voting rolls don't distinguish between those who voted *before* the error was corrected and those who voted *afterward.* They just record everyone who voted. *See* Iowa Code § 49.83 (requiring names of voters whose declaration of eligibility is approved to be marked on the election register).

For doctrinal purposes, I would distinguish the situation where strict compliance with a jurisdictional requirement is impossible from the situation where it is immaterial. If illegal votes were cast that could have decided an election, but there is no way to determine who cast them, it does not make sense to refuse to allow the election contest to go forward on that ground alone. *See Gluba v. State Objection Panel,* 11 N.W.3d 459, 467 (Iowa 2024) (requiring strict compliance with an election law after stating that the court was "not persuaded that strict compliance with [that law was] fundamentally unfair"); *Mansfield v. McShurley,* 911 N.E.2d 581, 586 (Ind. Ct. App. 2009) (holding that when a candidate could not have known that he might have lost the election until after the election contest deadline had passed, it was permissible to dismiss his

election contest where "the availability of *quo warranto* [gave him] a 'day in court' "); *cf. Leibsohn v. Hobbs*, 517 P.3d 45, 53 (Ariz. 2022) (declining to require strict compliance with an election law where it was impossible to do so).

Imagine a situation—not the situation here—where thousands of votes were cast by ineligible voters in a race decided by just a few votes, and there was no way to determine who those voters were. Would we say that the election contest cannot proceed at all because strict compliance with section 62.5(2)(*e*) did not occur? I hope not.

### III. Affirmance Is Still Appropriate Here.

Having said this, I would affirm the district court here. The contestants did not argue impossibility—they argued immateriality. And the district court didn't address impossibility. The issue is not before us.

Moreover, it is not clear what the remedy ought to be when illegal votes are cast but it's not possible to tell how those illegal voters voted. The contestants ask for a do-over election. But *Luse v. Wray*, 254 N.W.2d 324 (Iowa 1977) (en banc), suggests that may not be required. In *Luse*, which involved a State House election, 43 invalid absentee ballots were commingled with 92 valid absentee ballots, so it was impossible to tell which ballots were legal and which were illegal. *Id.* at 326. If all the absentee ballots had been counted, Candidate Stephens would have prevailed. *Id.* Instead, the Iowa House of Representatives declined to count any of the absentee ballots, meaning that Candidate Spradling prevailed. *Id.* We did not disturb that result, explaining:

> A practical problem confronted the House when it found the 43 patient ballots to be invalid. All absentee ballots were together; patient and non-patient ballots were indistinguishable. This is a problem which has faced the judiciary under statutes placing other election contests in the courts. Short of invalidating the entire election, no completely satisfactory answer exists. If all commingled ballots are set aside, as here, some voters with proper ballots are

disfranchised. If all commingled ballots are counted, invalid ballots are given effect. If the respective candidates are given the same proportion of votes in the number of valid ballots as they have in all commingled ballots, then some effect is actually given to the bad ballots and, in addition, the proportionate result is actually hypothetical. These problems have caused the courts to reach varying results in court-entertained election contests, including voiding a small number of otherwise valid ballots which were intermixed with invalid ones. . . .

Remembering that the House itself acts as a court in election contests for its seats and that no appeal lies, the House could select the manner of handling the intermixed ballots, and it decided not to count any of them. *We might or might not apply a different rule if the election contest were in the courts.* But Mr. Luse's challenge regarding the action of the House in setting aside the 92 ballots is not of constitutional proportions which would justify judicial relief.

*Id.* at 331–32 (emphasis added).

Finally, if you do the math, it seems highly unlikely that the improper votes here affected the result. There were 1,361 "yes" votes and 861 "no" votes in the referendum for a total of 2,222 votes. Hypothetically, if 80 of those votes were cast improperly in Ainsworth by out-of-district voters, 76 of those votes, or 95%, would have had to have been "yes" votes for the illegal votes, collectively, to have swung the election.

In sum, I would not disturb the judgment below or the outcome of the November 5, 2024 bond election.

For the foregoing reasons, I concur in the judgment.